Filed 2/7/24  P. v. Lubrin CA4/3
Opinion following transfer from Supreme Court

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>   Plaintiff and Respondent,<br><br>     v.<br><br>JEREH CATBAGAN LUBRIN,<br>RAFAEL RODRIGUEZ, and<br>MATTHEW THOMAS FARRIS,<br><br>   Defendants and Appellants. | G060424<br><br>(Super. Ct. No. C1519377)<br><br>O P I N I O N |

Appeal from judgments of the Superior Court of Santa Clara County, David A. Cena, Judge.  Reversed and remanded.

Goyette, Ruano & Thompson, Paul Q. Goyette and Janelle F. Crandall for Defendant and Appellant Jereh Catbagan Lubrin.

Rebecca P. Jones for Defendant and Appellant Rafael Rodriguez.

Eric S. Multhaup for Defendant and Appellant Matthew Thomas Farris.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Jefferey M. Laurence, Assistant Attorney General, Catherine A. Rivlin, Alice B. Lustre, Bridget Billeter and John Michael Chamberlain, Deputy Attorneys General, for Plaintiff and Respondent.

\*     \*     \*

In 2017, a jury convicted Santa Clara County Jail deputies Jereh Catbagan Lubrin, Rafael Rodriguez, and Matthew Thomas Farris (collectively, defendants) of the second degree murder of jail inmate Michael Tyree. (Pen. Code,[1] § 187, subd. (a).) The jury deadlocked on additional charges which accused defendants of assault by a public officer on another inmate, Juan V. (§ 149.) The trial court declared a mistrial on those counts, and the prosecutor later dismissed them. The court sentenced each defendant to an indeterminate term of 15 years to life.

Defendants' primary contention on appeal is that they were convicted under a since abrogated theory of murder liability and are therefore entitled to relief under the amendments made to California's murder law by Senate Bill No. 1437 (2017-2018 Reg. Sess.) (S.B. 1437) (Stats. 2018, ch. 1015, eff. Jan. 1, 2019 [amending §§ 188 and 189]) and Senate Bill No. 775 (2021-2022 Reg. Sess.) (S.B. 775) (Stats. 2021, ch. 551, eff. Jan. 1, 2022 [applying the amendments to all cases not yet final on appeal]).

Defendants also raise a host of other trial-related claims. These claims fall into three basic categories of alleged errors: (1) Pretrial Errors—the trial court erred by denying a change of venue motion and by denying Lubrin's motion to sever his case from that of his codefendants; (2) Evidentiary Errors—the trial court made several erroneous evidentiary rulings, including admitting at trial some of the defendants' statements, admitting evidence of defendant Rodriguez's internet searches, and limiting a defense expert's testimony; and (3) Instructional Errors—the trial court erred when it tailored

---

[1]     All statutory references are to the Penal Code unless otherwise indicated.

instructions for the jury; it also erred in its instructions related to S.B. Nos. 1437 and 775. Lastly, defendants claim the cumulative effect of these errors, even if each was individually harmless, was prejudicial.

We need not address the majority of defendants' arguments because we agree with their instructional argument which is dispositive. Like all defendants facing criminal prosecution, appellants were entitled to correct jury instructions and appropriate closing arguments by the prosecutor. The Attorney General cannot establish beyond a reasonable doubt that the jury would have reached its second degree murder guilty verdicts regardless of the incorrect statements of law included in the instructions given here. Neither the trial court nor the prosecutor erred at the time of trial because the instructions given to the jury, and which the prosecutor invoked in his closing argument, were correct at that time. Nevertheless, the changes subsequently made by the Legislature in the law of murder (S.B. 1437), which eliminated the natural and probable consequences (NPC) theory of liability, are so significant for determining the individual culpability of defendants charged with murder that state law mandates that those changes are retroactive (S.B. 775) to criminal judgments pending on appeal. So they must be applied here.

We reached the foregoing conclusions in our unpublished opinion in *People v. Lubrin* (Aug. 1, 2022, G060424); respondent then sought and obtained review to clarify the standard of review for harmless error in cases involving alternative-theory jury instruction error. As directed by the Supreme Court, we have vacated that decision and reconsidered the cause applying the high court's recent decision in *In re Lopez* (2023) 14 Cal.5th 562 (*Lopez*). After doing so, we arrive at the same result under *Lopez* and its progeny, including *In re Ferrell* (2023) 14 Cal.5th 593 (*Ferrell*). Accordingly, we reverse the respective judgments entered against each defendant and remand the case for further proceedings, including retrial at the prosecutor's election.

3

# FACTS

We lay out the facts in detail because, as we explain, our evaluation as to whether or not the prosecution's erroneous theory of second degree murder based on the NPC doctrine was harmless beyond a reasonable doubt requires us to "examin[e] the entire cause, including the evidence, and consider[] all relevant circumstances . . . ." (*People v. Aledamat* (2019) 8 Cal.5th 1, 3 (*Aledamat*).)

1.  *Evidence*

At the outset, we observe that the facts developed at trial are striking. On August 26, 2015, defendants were employed as Santa Clara County Sheriff's Department deputies assigned to the main county jail in San Jose. Farris and Rodriguez were hired in 2013, and Lubrin was hired in 2012.

On-duty deputies at the jail wore utility belts, which held mace, a flashlight, handcuffs, and a "yawara." A yawara is about eight inches long, with a patterned grip and rounded wooden ends. When doing cell checks, officers used their yawaras to tap on cell bars.

Testimony and documentary evidence that we excerpt below established that ensuring the safety and protection of inmates was a core responsibility of all jail deputies. They were required to conduct inmate welfare checks every hour to ensure that "the inmate's okay and not in need of any medical attention. Breathing, alive." If an inmate was injured or in physical distress, a "man down" call to jail supervisors was to be made expeditiously, typically by radio.

Use of force by jail deputies was highly regulated. Any use of force on an inmate had to be documented, and procedures required classifying and reporting any forcible contact with an inmate. If an inmate was injured, more extensive and formal narrative reports were required. Jailers were "allowed to use that force which is

4

objectively reasonable, given the facts and circumstances . . . to bring a situation under control."

When there was no imminent threat from an inmate, jail deputies were expected to contact a supervisor if they believed circumstances could deteriorate to a point at which force might become necessary. If a deputy did use force on an inmate, as soon as the threat was eliminated, "the inmate should be seen by a nurse immediately to either render first-aid, if it's necessary, or to determine that it's not necessary, that there was [*sic*] no injuries." "Whenever there is any type of pain compliance on a subject, we are going to go and get medical aid for them."

All deputy sheriffs, including defendants, received extensive academy training on use of force in the jail. They were instructed on which body parts to target, and which to avoid in order to minimize the chance of inmate injury. Specifically, deputies were taught not to hit an inmate's midsection since a blow to that area of the body could cause serious injury or death. They were allowed to kick an inmate's abdomen "to gain distance and time" and allow assessment of the situation. Deputies were trained on how to use their yawaras to apply pressure to sensitive points on an inmate's body, but they were directed not to use the yawara as a striking weapon, particularly on those parts of the body where damage to internal organs could result.

Jail deputies were also educated to be alert for inmates with mental health issues, including suicidal behavior, and to refer those inmates for mental health assessment and services. Special clothing and "suicide watch" provisions were available for such inmates.

Michael Tyree was booked into the jail on July 11, 2015, on unspecified "warrants." Although a previous booking record for Tyree had included mental health/suicidal codes, the July 11 booking classification did not. Thus, Tyree was not assigned to the "acute psyche ward" of the jail; instead, he was housed in a general population module in the main jail.

5

The module was a two-tiered dormitory that contained 48 cells. Tyree occupied a cell on the lower level, which measured approximately 12.5 feet long, six feet wide, and eight feet high. It had a hinged door that opened outward, a toilet/sink fixture, and a metal-framed bed. There was a barred window on the back wall, and a small wooden desk with a stool. Each cell was equipped with an interior call button to alert the module's duty officer. The bed, stool, and toilet were less than two feet high, the table less than two feet, five inches, and the sink was two feet, eight inches tall.

Tyree suffered from mental illness. Inmates in the module unit helped take care of him by giving him extra food when they found him eating out of the garbage; some gave him soap and encouraged him to shower. One inmate described Tyree as someone with "special needs" or "[a] normal person that's not all there." Another inmate said he knew Tyree was a "J Cat"—jail slang for a mentally ill inmate.

On the night of August 26, 2015, defendants were on duty and assigned to the module in which Tyree was housed. Between 7:20 and 8:00 p.m., a jail nurse conducted "pill call" to distribute medicine to inmates in the module. Tyree became confrontational with the nurse, and one inmate recalled Tyree making offensive comments to the nurse. Another inmate testified that Lubrin, while watching this encounter, was "smirking."

A commissary exchange took place between 8:19 and 8:59 p.m., followed by a clothing exchange for inmates to obtain fresh clothing items. Inmates were locked down in their cells sometime after 10:00 p.m.

Inmates testified Lubrin returned with Farris at about 10:30 p.m. to perform "bar checks" or cell "shakedowns," looking for contraband. A surveillance camera at the duty station pointed into the module, and a video recording from that night showed Lubrin and Farris entering the module at 10:38 p.m., followed by Rodriguez at 10:48 p.m.

6

Juan V. was an inmate in the same module; he was also considered to be mentally ill by other inmates. When Lubrin and Farris got to Juan's cell, several inmates testified they heard him "screaming, like, he was getting beat up." One inmate testified he heard Juan scream, "'Ah, get off of me.'" Inmates testified Rodriguez joined Lubrin and Farris in Juan's cell. They said Juan continued to scream for several minutes; one inmate said that it sounded like Juan "was getting roughed up."

Juan V. testified that Lubrin entered his cell that night and, after accusing him of unruly behavior on another occasion, hit him in the mouth with a closed fist. He said defendant Rodriguez then hit him in the head, and when he got back to his feet Lubrin put him in a headlock. Juan said all three defendants began punching him at that point; he was thrown against the wall, and someone twisted his arm. Defendants then threw him onto the bed, where Lubrin kneeled on his back and punched him in the back of the head.

Other inmates heard the confrontation. They testified Juan yelled, "'Please stop. Stop'"; "'I am a bitch. I am a bitch'"; "'Leave me alone'"; "'Stop hitting me'"; "'Stop slapping me, I'm not a bitch.'" They also heard slapping sounds. One inmate testified he heard defendants ask Juan "why he was acting up." Juan testified that defendants eventually left him in his cell. Soon thereafter the three defendants arrived at Tyree's cell.

Inmate Kevin L. was in the cell adjacent to Tyree's. He testified that Farris stopped at Tyree's door and said, "'I tell you to do something, I mean fucking do it.'" All three defendants then entered Tyree's cell. Tyree told them to leave him alone. Kevin L. heard the sound of "somebody being rushed, a lot of thumping around, and the bed, you know, somebody got basically, you know, tackled on the bed . . . ." Tyree was saying, "'Oh, no. Fuck. Get off me. Oh, my God'"; there was "a lot of screaming." The screaming was loud: "[a] good 7" on a scale of 1 to 10. Kevin L. said Tyree screamed, "'Stop'" several times, yelling "'Please. Oh, God. Stop. Please. Jesus. Oh'" and

7

"'Stop. Please. I'll be good.'" Kevin L. testified it sounded like defendants had slammed Tyree against the wall. He also heard what sounded like blows being delivered to Tyree's body, making dull thudding sounds. He said Lubrin then told Tyree to stay quiet the rest of the night, turned out the light, and left the cell.

Fifteen seconds after defendants went into Tyree's cell, one inmate said, "Tyree started screaming for his life." Another said when defendants reached Tyree's cell, "I heard screaming again. So I got up, and I looked out my cell door, and I just seen Tyree's cell . . . the cell was open, and I heard him yelling, 'I'm sorry for whatever I did. Please just stop hitting me.' That pretty much sums it up." Another inmate recalled Tyree loudly screaming, "'Ow. Help. Help. Stop. Stop,'" and another inmate said Tyree's screams were "[w]ay louder" than Juan V.'s had been.

One inmate testified all three defendants were in Tyree's cell when the loud sounds were heard. He said the sounds were clear: "He was just screaming, 'Help. Stop. Please stop. Help.' And all you heard was 'boom, boom,' and I was, like, 'Oh shit.'" Another said he heard "thumps." One heard Tyree saying, "'Please. I'm sorry. I'm sorry,'" while another heard Tyree yelling, "'Stop. Sorry,'" so loudly that he felt sure "the whole pod heard it." Four other inmates in the module testified they could also make out the words, "'I'm sorry.'"

"Obviously . . . he was being hurt," one inmate testified. Another said Tyree was screaming "like, he was in pain"; another heard Tyree yelling "really loud," and said it "sounded like a voice in pain." According to another inmate: "He was begging and screaming. Sounded like he was in a lot of pain." That inmate summarized, "it sounded like a little kid crying."

Tyree's screams lasted four to five minutes. At some point during the incident, one of the defendants partially closed Tyree's cell door and stood at the threshold. Several inmates testified they saw or heard the lights in Tyree's cell go off, his

8

cell door close, and defendants walk away. These inmates also testified they heard one of the defendants say something like, "I don't want to hear a word out of you all night."

The surveillance video showed defendants walking out of the module at about 11:09 p.m. The lights in the module went off within a minute. The video showed defendants removing their gloves; Rodriguez appeared to be smiling.

Kevin L. testified he spoke to Tyree "till he died." He said when he asked Tyree if he was all right, Tyree responded "'it hurt,'" and Kevin L. could hear him crying. Tyree seemed to be "in a lot of pain." Tyree said he was "'sick and tired of being beat up. If they want to kill me, I should just kill myself.'" Kevin L. said he could tell Tyree "was pretty hurt," and suggested he drink some water. He heard Tyree slowly pacing back and forth in his cell; he also heard Tyree run water from his sink and flush the toilet. About 15 or 20 minutes after defendants left Tyree's cell, Kevin L. heard a "thud."

At 12:07 a.m., the surveillance video showed Lubrin reentering the module. Lubrin kicked at Tyree's door a few times, called Tyree's name, and made what several inmates described as nudging kicks while saying, "'Hey, hey.'" One inmate heard Lubrin say, "'Get up, Tyree. You stink.'"

Lubrin left and came back with Farris and Rodriguez. At 12:10 a.m., Rodriguez was shown in the video picking up a phone handset at an officers' station. The video showed Rodriguez and Lubrin interacting near the entrance to the module. The lights in the module remained out. The video showed Rodriguez putting on gloves, then walking away from the module while Lubrin remained at the doorway for approximately 18 seconds. Rodriguez then picked up the logbook and walked toward the module. Just before 12:12 a.m., Farris appeared behind the officers' station.

According to the watch commander's log, a "man down" call was transmitted at 12:12 a.m., five minutes after Lubrin reentered the module. Inmates said Lubrin dragged Tyree out of his cell and began CPR. Tyree was naked.

9

At about 12:13 a.m., two other officers appeared on the video. The module lights went on about 30 seconds later. Jail protocol was to illuminate the area when an incident occurred for the safety of responding staff and to facilitate the provision of aid. A medical team responded around 12:14 a.m.; Tyree was pronounced dead at approximately 12:35 a.m. At 1:01 a.m., Farris placed a cell phone call to Lubrin.

When investigators reached the scene, Tyree lay dead on the floor of the module near his cell. His cell door was open, and there was vomit and feces visible. No noose or ligature material that could have facilitated suicide was found in the cell; there was handwriting on the wall.

Defendants ended their shifts at 6:00 a.m. At 6:04 a.m., and again at 6:29 a.m., Farris called Lubrin from his cell phone. At 6:28 a.m., this Google search was queried from Farris's phone: "'What happens when you eat poop?'" At 6:45 a.m., Lubrin and Farris texted each other. Lubrin said, "'Shit,'" and asked, "'Where is "Rod?'" Farris sent a text reading, "'We waited for you and called, man.'" Lubrin suggested they meet before work that night.

At 7:11 a.m., and again at 12:48 p.m., Farris texted correctional officer Corey E. asking for an update on the situation at the jail. Starting at 8:37 a.m., internet searches were conducted from Rodriguez's cell phone. The initial Google query was "'Can you die from punches to you.'" The search engine's auto-correction feature suggested, "'Can you die if someone punches you in the armpit,'" and the user clicked on those revised search terms. A second search began with the query, "'Can you die if someone punches you in the rib?'"

Defendants started their shifts at the jail that evening at 6:00 p.m.; they were pulled off duty at 10:00 p.m. Earlier, the day shift module officer had responded to a text message from Lubrin asking for information; they spoke on the phone. When told that he was being investigated in connection with Tyree's death, Lubrin responded he would be okay because "[h]e had two other officers in there that have his same story."

10

Dr. Joseph O'Hara of the Santa Clara County Medical Examiner-Coroner's Office responded to the county jail following notification about Tyree's death. He found Tyree's body on the floor of the housing module. He said there was vomit and feces "everywhere," and there was evidence jail personnel had attempted to resuscitate Tyree. Nothing about the scene suggested to O'Hara that the manner of death was suicide.

O'Hara performed an autopsy the following day. Tyree had two lacerations on his face, and a bruise to his cheek. The lacerations—one near the right eyebrow and one on the left side of the chin—were blunt force injuries that had bled, indicating infliction at or about the time of death. The bruise on his left cheek was also caused at or near the time of death.

There was a "large hemorrhage" to the muscle on the left side of Tyree's skull where it attached to the jaw. It resulted from an impact to that side of his head near the time he died. The presence of injuries on both sides of Tyree's head suggested that they had not been incurred in a single event, such as a fall.

Abrasions, contusions, and lacerations covered the front, back, and both sides of Tyree's body. Two abrasions and several contusions on Tyree's back were received about the time of death. There was also an abrasion on Tyree's right clavicle and a bruise in his right armpit. O'Hara observed "at least four separate areas of hemorrhage into . . . soft tissue" underneath the back contusions, as well as "at least three" areas of hemorrhaging from broken blood vessels in the underlying muscle. There were abrasions on Tyree's right shoulder similar in pattern to other abrasions O'Hara had documented on his back and hip. There were multiple abrasions on both hips and the right ankle, one on the right thigh, and three on the lower right leg. There were additional contusions on Tyree's left thigh, right knee, lower right leg, lower left leg, and right ankle.

Internally, O'Hara found a "significant" laceration to the front of Tyree's liver, covering more than six square inches and extending about one inch deep. O'Hara

11

later opined, "If I had an individual in a car crash with only that injury, unless the accident happened in front of the hospital, they probably would bleed out and be dead in a matter of minutes." O'Hara found over 2,000 milliliters of blood in the cavity between Tyree's abdominal wall and internal organs, an amount which comprised 40 to 50 percent of Tyree's blood. He believed a liver injury like Tyree's could have been caused by a blow to the abdomen that crushed the back of the liver against the bony spinal column, a blow to the back while the person was lying on the ground, or possibly forceful application of CPR. After reviewing a video of the CPR performed on Tyree by jail personnel, O'Hara said he did not observe responders pressing on his abdomen.

O'Hara testified Tyree also suffered a "catastrophic laceration of his spleen." It was lacerated to a depth of one inch, across its upper third, and the spleen was "almost torn in half." Half an inch more on either side and "the spleen would have been torn in two pieces." This was consistent with either an acceleration injury, where "something impacted his abdomen with a great deal of force," or with a crushing injury. O'Hara testified that "liver and spleen lacerations are the least frequent complications of CPR," and referred to an article that found CPR-related injuries "to the liver, spleen, pancreas, stomach, and intestinal lacerations are rare."

O'Hara observed hemorrhaging in the lining where the stomach joins the esophagus, as well as in Tyree's small intestine. He said a person who suffers injuries to the spleen and liver, resulting in bleeding into the abdominal space, would experience significant pain, would vomit, and uncontrollably expel feces and urine, and ultimately slip into unconsciousness. Even so, the victim could remain ambulatory until losing consciousness.

O'Hara opined Tyree's death was caused by "multiple blunt force injuries to include visceral lacerations and hemoperitoneum"; he concluded the manner of death was homicide. O'Hara counted 34 separate injuries inflicted on Tyree, including "a catastrophic abdominal injury from either being crushed or a blow into the abdomen."

12

He estimated Tyree's death occurred between five and 50 minutes after infliction of the injuries.

O'Hara dismissed the possibility that Tyree's injuries could have resulted from a fall in his cell: "[W]hether he was dizzy or not, it's impossible for him to have fallen 18 or 15 feet and ruptured his own spleen." He testified a three-foot fall would not generate sufficient force to lacerate a spleen. Having examined about 8,000 bodies and conducted about 4,000 autopsies, O'Hara stated, "The only time I [have] ever seen a spleen rupture is when they're hit by a train, they're in a car crash, they fall off a roof, or they're beaten to death."

DNA analysis of a swab collected from Rodriguez's yawara stick was compared to profiles of Tyree and Rodriguez. The results indicated a mixture of DNA from at least three contributors. Assuming there were two major contributors to the mixture, it was 460 quintillion times more likely to see those DNA data if the sources were Tyree and Rodriguez than if the sources were two unknown people. Lubrin's yawara stick showed a mixture of DNA, but Tyree was excluded as a potential contributor.

C.B., a witness who had known and seen Lubrin since 2013 through their military reserve service, testified Lubrin talked about his work at the jail, and told C.B. that "he was very rough" in his physical interactions with inmates, that inmates were scared of him, and that he had received complaints concerning use of excessive force. Lubrin told C.B., "'Beating people up is part of my job at the jail.'" Lubrin told C.B. about an incident in which an inmate had hit a jail deputy and in reprisal a group of officers, including Lubrin, took the inmate to a separate room without cameras and took turns punching him. Lubrin also told C.B. he sometimes used the knob end of his yawara on inmates because "it hurts more."

Investigators executed search warrants at Rodriguez's and Farris's residences. Among other items, they seized cell phones. Investigators later extracted

13

data from the phones. That same day, investigators located Lubrin and seized his cell phone, which was examined by a digital forensics expert; the expert was unable to extract data from it because it had been cleared and restored to its "factory setting." All personal information, including call records and text messages, had been deleted.

Before Tyree's death, Farris had exchanged text messages with another jail staffer in which he indicated certain behavior from inmates "'downtown'" would result in a "'full-blown, beat the fuck down.'" On July 11, Farris and another person discussed the need to "'handle[]'" inmates who "'mess[] with'" jail deputies. He also texted that he had "'just pulled a dude out'" and "'had to show him some love.'" On July 12, Farris texted a coworker, "'We been breaking fools off this week.'" On July 15, Farris texted, "'We just had a good fight. Hella OC S-p-r-s-y [*sic*].'" A minute later, Farris texted, "'Lubrin sprayed a guy, so much OC Spray.'" On July 20, Farris received a text from a colleague reporting that he was "'going to start pulling people out at 2:00 a.m. for no reason to twist them up.'" Farris replied, "'Come to the 6th [Floor], bro'" and "'We do it at 0001, not 0200.'"

On July 24, Farris texted Rodriguez and recommended that Rodriguez "'just twist fools up but write paper.'" Farris accused coworkers in Rodriguez's unit of being "'[i]nmate lovers,'" noting that he "'love[d]'" his assignment on the sixth floor because there was "'no camera and no groups . . . .'" A few minutes later, Rodriguez described to Farris, and expressed amusement over, how Rodriguez slapped an inmate and said, "'I am the wrong guy to fuck with.'" Farris replied, "'Bahaha, Dude, fuck those clones. Get rolled up but don't get in trouble.'" Farris then offered advice to Rodriguez about a person who could "'teach you about what you do and who you do it in front of.'"

On July 27, Lubrin participated in a text message exchange discussing how deputies "smashed" an inmate, and then Lubrin wrote, "'But [Juan V.]!!!! Smashed shit on his face, hahahahahahahaha.'"

14

On July 30, Rodriguez texted Ferris and reported having "'popped'" and "'twist[ed] up'" an inmate. Farris expressed amusement. On August 1, Farris observed in a text message that, "'[i]n jail, if you don't empty your can [of pepper spray], p-p-l talk shit about you. Lol.'" On August 8, Farris texted that he had been questioned "'on hella shit'" by his superiors after he "'intuned a guy up'" and the inmate broke his cell window.

On August 12, Farris complained to a colleague that he was going to "'get scolded today for a hands-on incident that happened last week, Lol.'" Farris agreed that he would be "'fine'" because there was "'[l]ots of use of force.'" On August 13, Farris reported by text that jail was "'[c]ool'" because he "'pulled a guy out.'" The other person on the exchange replied, "'Nice little dinnertime scuffle.'" On August 14, Farris sent a text message to a colleague noting that an inmate "'is terrified of me,'" and expressed amusement ("'Hahahahahaha'") about how he "'got into it'" with an inmate, "'[s]creamed at him and locked him down, bro.'" Also on August 14, Farris and a coworker commiserated about an inmate, and Farris said, "'I screamed at him, Bahahaha,'" and "'Haha, that guy's a bitch, man. Totally submissive.'" On August 15, Farris reported to the coworker that he and others "'handled'" an inmate. After the coworker said he "'wanted to hit him today,'" Farris reassured him: "'We got him, bro, he was a bitch, haha. I told him, you want to fuck with my partners, fool.'" On August 17, Farris responded to a text about the need to "'reclaim the town'" by noting that, "'in jail, bro, we don't even wait a second, like l-g-b-g, it's hand-on so fast, bro.'" His coworker advised Farris to "'pump the brakes'" so he did not "'have to write so much . . . .'" Farris commented, "'Lol. I had to drop some pain on this guy one time.'"

Following the close of the prosecution's case, defendants introduced testimony from four expert witnesses who criticized the adequacy of the investigation, the conclusions of the coroner, and whether the inmates could have heard what they

15

testified to from their vantage points.  One expert opined Tyree's death was either an accident or suicide.

In the prosecution's rebuttal case, Michelle Jorden, the chief medical examiner for Santa Clara County, testified as an expert in forensic pathology, neuropathology, and identification of pattern injuries.  Jorden conducted a neuropathologic examination of Tyree's brain, and reviewed O'Hara's autopsy report, investigation photographs, and the CPR video.  Jorden concluded Tyree's manner of death was homicide, caused by multiple blunt force injuries, explaining that the absence of broken ribs did not preclude infliction of blunt force injuries.  In addition, Jorden opined Tyree's liver injury resulted from blunt force applied to his abdomen, and not from administration of CPR.

2.      *The Jury Instructions as Restated in the Prosecutor's Closing Arguments*

During his closing argument, the prosecutor told the jury:

"Here's what the definition of murder is for our purposes here.  Every person who unlawfully kills another human being with malice aforethought is guilty of murder. . . .  [¶]  So part [1] is someone did something that caused the death or had a duty to do something, didn't do it, and that contributed or was the cause of the death.  That's part 1.  [¶]  . . . [¶]  Part 2 is this:  When the defendant acted or failed to act, he had a state of mind called malice aforethought.  [¶]  Now what does that mean?  Well, there's different kinds.  Malice can be either express or implied. . . .  [¶]  [I]mplied malice [is] what we have in this case.  That's what applies here. . . . The defendant acted with implied malice if the following is shown:  (1), he intentionally committed an act or failed to act. . . .  [¶]  (2), the natural and probable consequences of the act or omission were dangerous to human life. . . .  [¶]  . . . Do we have that?  Of course we do.  Someone is physically beaten to the point where their internal organs are either ruptured or damaged.  Is the natural probable consequence of that, is the foreseeable result of that that it's

16

dangerous to human life? Of course. Of course it is. So we have that. [¶] (3), at the time that he acted or failed to act, he knew doing so was dangerous to human life. Now, do we have that too? Yes, we do."

Later in his argument, the prosecutor added this: "We have, in this case, shown what is called second degree implied malice murder: Actions or failure to act coupled with what is called malice aforethought, meaning awareness that it's dangerous and doing it anyways." "[T]he evidence shows that [implied malice] applies to all three [defendants], because all three were in the cell . . . when the assault happened; so have an awareness of . . . what went down in terms of force and where the body was hit. All three of them have this training that tells them to avoid certain parts of the body. It applies to all three."

The prosecutor then segued into the now-abrogated NPC theory of liability. After explaining that under the "'natural and probable consequence[s]'" doctrine, "if . . . someone else in your group ends up committing another crime" that one defendant did not intend to commit, that other defendant "can still be responsible—*is* responsible for the greater crime" (italics added), despite the fact that he lacked any intent to commit the crime.

**DISCUSSION**

1. *Theories of Guilt at Trial; Subsequent Enactment of Senate Bill Nos. 1437 and 775*

The prosecution presented evidence, and the jury was instructed on, one theory of first degree murder and two theories of second degree murder. The jury's second degree murder guilty verdict for each defendant indicates it rejected the prosecution's theory of first degree felony murder based on burglary, i.e., that defendants each crossed the threshold of Tyree's cell specifically intending to commit a felony

17

against him and they caused his death while committing that felony. (§ 189; see CALCRIM No. 540A.)

The trial court's instructions and verdict forms did not require the jurors to agree on a theory of second degree murder. Nor did the instructions require the jurors to specify the theory on which they relied in reaching their verdicts. The court's instructions gave the jury two alternative theories regarding second degree murder. The first, as explained by the prosecutor during his final argument, involved implied malice murder in which each defendant acted with malice aforethought to cause Tyree's death. (§ 187; see CALCRIM No. 520.) The alternative theory, again as discussed by the prosecutor during his argument, involved a second degree murder based on an aggravated assault or an assault under color of authority during which a person in each defendant's position would have known that murder was a "natural and probable consequence" of such an assault. (§§ 245, subd. (a)(1); 149; see CALCRIM No. 403.)

While the latter was a valid theory when this case was tried, the Legislature has since amended the Penal Code to eliminate NPC liability for murder (S.B. 1437), and to permit defendants to rely on that change in the law to challenge their conviction on direct appeal (S.B. 775).

The Attorney General does not dispute that these defendants are entitled to the benefit of the changes made by S.B. 1437 and S.B. 775, or that, under the new law, the jury was erroneously instructed on the NPC theory of second degree murder. The Attorney General nonetheless argues that since the jury was also instructed with a still-valid theory of second degree murder liability—implied malice murder—any error arising from the trial court's instructions on the NPC theory was harmless. After carefully reviewing this extensive record, we are not convinced.

18

2.     *Legal Background*

     A.     *Natural and Probable Consequences Doctrine, as Applied Here*

Before the passage of S.B. 1437, "the natural and probable consequences doctrine rendered a defendant liable for murder if he or she aided and abetted the commission of a criminal act (a target offense), and a principal in the target offense committed murder (a nontarget offense) that, even if unintended, was a natural and probable consequence of the target offense." (*People v. Lamoureux* (2019) 42 Cal.App.5th 241, 248.)

In this case the prosecutor expressly relied on this doctrine in seeking defendants' conviction for second degree murder. The prosecutor recognized jurors might conclude one or more of the defendants "didn't have all this—the other requirements" of implied malice second degree murder or first degree felony murder; he nevertheless urged the jury to find each defendant guilty of second degree murder because of what "[t]he law says" regarding "what they call a 'natural and probable consequence' . . . ."

Specifically, after discussing the essential "components" of implied malice murder, which the prosecutor defined as "awareness that it's dangerous and doing it anyways," the prosecutor unequivocally invoked the NPC doctrine as an alternative theory for second degree murder: "But just for argument purposes, let me walk you through—if you said to yourself, 'Well, what if only the person who actually—what if only one of them did the beatdown and the others wanted only to help an assault? They didn't have all this—the other requirements? What does the law say about this?'"

The prosecutor answered his own question: "The law says that if you set out to engage in one crime, and someone else in your group ends up committing another crime, if that other crime is what they call a 'natural and probable consequence,' it means foreseeable that that's what could happen under the circumstances, that person can still be responsible—is responsible for the greater crime. Why is that? Because the law says

19

there's certain types of behavior we just don't want any—we want to frown upon, we don't want to engage in, [such as] we don't want gang members going to, you know, one place to start a fight knowing that it could easily escalate into something, you know, lethal, after the fact. So we say that if you start with a mindset of one crime and someone else in that group commits another crime, if that was foreseeable, then that person is also responsible for the greater crime." The prosecutor emphasized the NPC theory was an alternative to first degree felony murder and implied malice second degree murder: "And that is," he argued referring to the NPC doctrine, "at the bare minimum, what we have in this case . . . ."

Subsequent to defendants' conviction, but before they filed their appellate briefs, S.B. 1437 "eliminate[d] natural and probable consequences liability for first and second degree murder." (*People v. Gentile* (2020) 10 Cal.5th 830, 849 (*Gentile*), superseded by statute on another ground as stated in *People v. Wilson* (2023) 14 Cal.5th 839, 869.) Indeed, "the natural and probable consequences doctrine authorizes precisely what Senate Bill 1437 forbids: it allows a fact finder to impute malice 'to a person based solely on his or her participation in a crime.' [Citation.] Under the doctrine, 'individuals lacking the mens rea and culpability for murder [are] punished as if they were the ones who committed the fatal act.'" (*Gentile*, at p. 847.)

S.B. 1437 made "personally possessing malice aforethought a necessary element of murder. Natural and probable consequences liability for murder contains no such requirement. [¶] The language of section 188(a)(3) [as enacted by S.B. 1437] requires a principal to 'act with malice aforethought' in order to be convicted of murder, making no exception for accomplices or second degree murder. [Citation.] By its terms, section 188(a)(3) permits a second degree murder conviction only if the prosecution can prove the defendant acted with the accompanying mental state of mind of malice aforethought. The prosecution cannot 'impute[] [malice] to a person based solely on his or her participation in a crime.'" (*Gentile, supra,* 10 Cal.5th at p. 846.)

20

S.B. 1437 did not repeal the law which imposes criminal liability for implied malice murder.  (*Gentile, supra*, 10 Cal.5th at p. 850.)  To the contrary, "notwithstanding Senate Bill 1437's elimination of natural and probable consequences liability for second degree murder, an aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life." (*Ibid.*)

    B.  *Implied Malice Murder; Requisite Jury Findings*

    In a homicide, "the dividing line between the actual perpetrator and the aider and abettor is often blurred.  It is often an oversimplification to describe one person as the actual perpetrator and the other as the aider and abettor.  When two or more persons commit a crime together, both may act in part as the actual perpetrator *and* in part as the aider and abettor of the other, who also acts in part as an actual perpetrator." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1120.)  Thus, "in a homicide prosecution *not* involving felony murder or the natural and probable consequences doctrine, the aider/abettor's guilt is based on the combined acts of all the principals *and on the aider/abettor's own knowledge and intent*."  (*People v. Amezcua and Flores* (2019) 6 Cal.5th 886, 917, italics added.)

    The focus of our review therefore must be whether the jury's verdict indicates jurors concluded beyond a reasonable doubt each defendant's "knowledge and intent" related to Tyree's slaying met the standard for implied malice second degree murder.  If the jury's verdict is not itself dispositive on that question, we must determine whether the evidence presented made it "impossible" for a jury *not* to find each defendant harbored the requisite implied malice.  (See *Lopez, supra*, 14 Cal.5th at pp. 585-592.)  As the Supreme Court noted, our scrutiny on these issues must be "exacting."  (*Id.* at p. 581.)  We must determine "whether any rational juror who made the findings reflected in the

21

verdict and heard the evidence at trial could have had reasonable doubt regarding the findings necessary to convict the defendant on a valid theory." (*Id.* at p. 591.)

As we begin our evaluation of the evidence presented at trial that relates to these issues, we keep in mind the elements required to prove implied malice second degree murder.

Malice aforethought is the defining characteristic of murder (§§ 187, subd. (a); 188, subd. (a)(3)); malice may be express or implied (§ 188, subd. (a)(1) & (2)). In addition to the prosecutor's theory of murder as a natural and probable consequence of assault—rendered invalid by S.B. 1437, as discussed—the jury was also instructed on implied malice murder as an alternative basis for a second degree murder conviction. (CALCRIM No. 520.) "The primary difference between express malice and implied malice is that the former requires an intent to kill but the latter does not." (*People v. Soto* (2018) 4 Cal.5th 968, 976.)

"'Malice is implied when the killing is proximately caused by "'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.'"'" (*People v. Cravens* (2012) 53 Cal.4th 500, 507 (*Cravens*).) Implied malice thus includes an objective component—an act that is dangerous to life—and a subjective component—the defendant's awareness of and disregard for that objective danger. (*People v. Knoller* (2007) 41 Cal.4th 139, 153-154, 157 (*Knoller*).)

Focusing first on the objective element: "To suffice for implied malice murder, the defendant's act must not merely be dangerous to life in some vague or speculative sense; it must "'involve[] a high degree of probability that it will result in death.'"'" (*People v. Reyes* (2023) 14 Cal.5th 981, 989 (*Reyes*); see *Cravens*, *supra*, 53 Cal.4th at p. 513 (conc. opn. of Liu, J.) ["Although an act that will certainly lead to

22

death is not required, the probability of death from the act must be more than remote or merely possible"].)

As for the subjective element, recognizing that one's actions pose general safety risks or even a risk of great bodily injury is not sufficient. (*Knoller*, *supra*, 41 Cal.4th at pp. 143, 153-156.) A person "acts with implied malice only when acting with an awareness of *endangering human life*." (*Id.* at p. 153.) "[A] finding of implied malice depends upon a determination that the defendant *actually appreciated* the risk involved, i.e., a *subjective* standard." (*People v. Watson* (1981) 30 Cal.3d 290, 296-297.) "[I]mplied malice requires a defendant's awareness of engaging in conduct that endangers the life of another—no more, and no less." (*Knoller*, at p. 143.)

A defendant may be liable for implied malice murder either as the actual killer or by aiding and abetting the perpetrator who committed the killing. (*Reyes*, *supra*, 14 Cal.5th at p. 990.) As *Reyes* explained, "In the context of implied malice, the actus reus required of the perpetrator is the commission of a life-endangering act. For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life-endangering act. Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act." (*Id.* at p. 991.)

In *Reyes*, the Supreme Court found the evidence did not support an implied malice murder conviction—whether as a perpetrator or an aider and abettor—where a 15-year-old gang member, in the trial court's words, "intentionally committed the act of traveling 'along with several other gang members, one of which [was] armed, . . . to rival gang territory'" by bicycle. (*Reyes*, *supra*, 14 Cal.5th at p. 987.) This act was not a life-endangering act which could generate direct perpetrator liability. The Supreme Court noted that "Reyes was not the shooter"; rather, he followed the victim's car, along with "fellow gang members, one of whom was armed," to "the edge of territory belonging to a rival gang." The court acknowledged "[i]t may have been likely that this act would result

23

in some sort of gang confrontation, and it is possible that someone would get hurt or killed." Nevertheless, the Supreme Court concluded "the act does not by itself give rise to a high degree of probability that death will result." (*Id.* at p. 989.)

The Supreme Court discussed the impact of the prosecution's gang expert who testified "that Reyes was providing 'backup' to the shooter, as well as Reyes's use of the same gun in [a] subsequent attack on [another victim,] Nieves." The court determined this evidence was "insufficient to support a conclusion that Reyes committed *an act* that carried a '"high degree of probability"' of death." (*Reyes*, *supra*, 14 Cal.5th at pp. 989-990, italics added.)

*Reyes* also explained that, to the extent the trial court may have believed the defendant was guilty of implied malice murder as an aider and abettor, the court misapprehended the law: "'to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act.'" The Supreme Court explained, "'The mens rea, which must be personally harbored by the direct aider and abettor, is [1:] knowledge that the perpetrator intended to commit *the act*, [2:] intent to aid the perpetrator in the commission of *the act*, [3:] knowledge that *the act* is dangerous to human life, and [4:] acting in conscious disregard for human life.'" (*Reyes*, *supra*, 14 Cal.5th at p. 991.)

With these principles in mind, we turn to the Attorney General's argument that trying defendants on a theory of NPC liability for second degree murder—in addition to a theory of implied malice murder—was harmless error because any rational jury necessarily would have found the elements of the latter theory true based on the evidence presented.

3. *Harmless Error: The Standard and Our Analysis*

Giving the jury two alternate legal theories on which to convict defendants of second degree murder here "presents the type of 'alternative-theory error' that occurs when "'a trial court instructs a jury on two theories of guilt, one of which was legally

24

correct and one legally incorrect."'" (*Ferrell*, *supra*, 14 Cal.5th at p. 602.) Providing legally incorrect instructions as a basis for conviction "violate[s] a defendant's constitutional right to 'a jury properly instructed in the relevant law.'" (*Ibid*.)

We review the constitutional violation "under the heightened standard of *Chapman v. California* (1967) 386 U.S. 18, the same standard of prejudice applicable to other instructional errors that misdescribe criminal offenses." (*Ferrell*, *supra*, 14 Cal.5th at p. 602; see *Aledamat*, *supra*, 8 Cal.5th at pp. 7-13.) Under *Chapman*'s "familiar standard," we must reverse the judgment based on the instructional error "'unless the reviewing court concludes beyond a reasonable doubt that the error did not contribute to the verdict.'" (*Aledamat*, at p. 10.) "The proper analysis under *Aledamat* does not rest on "'the likelihood that the jurors would have applied the erroneous instruction,'" but whether the jury could have found what it did find without also making the findings necessary for a valid theory." (*Lopez*, *supra*, 14 Cal.5th at p. 589.)

"Harmlessness can be shown "'if the jury verdict on other points effectively embraces'" the valid theory" (*Ferrell*, *supra*, 14 Cal.5th at p. 602), as when findings in the verdict indicate the jury "necessarily found the defendant guilty on a proper theory" (*People v. Guiton* (1993) 4 Cal.4th 1116, 1131). "In other words, if "'[n]o reasonable jury that made all of these findings could have failed to find'" the facts necessary to support a valid theory, the alternative-theory error was harmless. [Citation.] Indications that the jury considered an invalid theory, without more, do not undermine that conclusion." (*Lopez*, *supra*, 14 Cal.5th at p. 592; accord, *Ferrell*, *supra*, 14 Cal.5th at pp. 602-603.) Nor does the prosecutor's "mere reliance on an invalid theory" in argument. *(Lopez*, at p. 590.) When an instruction omits an element of the offense, the omission is harmless if, at the end of the day, it is apparent that "the jury necessarily found the omitted element in connection with other findings required by the instructions." (*People v. Flood* (1998) 18 Cal.4th 470, 506.)

25

After scrutinizing this record, we cannot conclude that is the case here for a number of reasons, including the fact the jury's findings other than their guilty verdict for second degree murder reflect conclusions that do not support the Attorney General's current arguments. The jury rejected the prosecutor's first degree felony murder theory (See CALCRIM No. 520), and it was unable to reach a verdict on an assault charge involving a different victim on a different occasion. Nothing in the jury's second degree murder verdict indicated why jurors found defendants guilty of murder. There were no other findings or verdicts to suggest the jury found true the elements necessary to support the valid implied malice theory rather than the invalid NPC theory. (See, e.g., *People v. Covarrubias* (2016) 1 Cal.5th 838, 902, fn. 26 [verdicts on other crimes and special circumstance findings conclusively established first degree felony murder]; see also *Lopez*, *supra*, 14 Cal.5th 562 [even assuming that the jury found gang-murder special circumstance true based on its belief that the defendant intentionally killed the victim, the special circumstance did not itself establish elements of first degree premeditated murder].)

Of course, a reviewing court is not restricted to finding alternative-theory error harmless "only where 'there is a basis in the record to find that "the jury has 'actually' relied upon the valid theory."'" (*Lopez*, *supra*, 14 Cal.5th at p. 580.) Instead, the relevant inquiry is "whether any rational jury would surely have rendered the same verdict had it been properly instructed." (*Id.* at p. 584.)

Review which employs this analysis is often marked by "shorthand" use of terms like "overwhelming" evidence or "no possibility" of a contrary result. (*Lopez*, *supra*, 14 Cal.5th at p. 588.) Harmless error can be shown "'"if it is *impossible*, upon the evidence, to have found what the verdict *did* find without finding"'" the facts underlying the valid theory as well." (*Ferrell*, *supra*, 14 Cal.5th at p. 602, italics added.)

But as the United States Supreme Court has emphasized, this approach requires caution. (*Neder v. U.S.* (1999) 527 U.S. 1 (*Neder*).) "[I]n walking the

26

'tightrope' of this aspect of harmless error review[,] we must avoid 'displacing the jury as finder of fact' on contested issues." (*Ferrell*, *supra*, 14 Cal.5th at p. 608.) A reviewing court does not reweigh the strength of each party's evidence; it does not "'become in effect a second jury to determine whether the defendant is guilty.'" (*Neder*, at p. 19.) Consequently, "while 'overwhelming' evidence may demonstrate harmlessness, a court's analysis of whether the evidence is 'overwhelming' in this context is not as subjective or free-ranging as that term might imply. Instead, the analysis requires a court to rigorously review the evidence to determine whether any rational juror who found the defendant guilty based on an invalid theory, and made the factual findings reflected in the jury's verdict, would necessarily have found the defendant guilty based on a valid theory as well." (*Lopez*, *supra*, 14 Cal.5th at p. 568.)

In conducting this review, "[t]he question here is not the sufficiency of the evidence to support a valid theory, but its opposite." (*Lopez*, *supra*, 14 Cal.5th at p. 591.) The burden rests on the Attorney General to demonstrate the instructional error was harmless beyond a reasonable doubt. (*Id.* at p. 585.) "Given the standard of review for alternative-theory error, we do not view the evidence supporting the valid theory in the light most favorable to the prosecution." (*Ferrell*, *supra*, 14 Cal.5th at pp. 604-605.)

Nor do we presume the existence of any facts the jury might reasonably infer in favor of the prosecution. (*People v. Mil* (2012) 53 Cal.4th 400, 418.) To the contrary, we are required to consider the evidence in the light most favorable to the defendant; in doing so, we do not reweigh the evidence or resolve evidentiary conflicts. (*Ibid.*; *People v. Valenti* (2016) 243 Cal.App.4th 1140, 1166-1167.) Nor do we make witness credibility determinations adverse to the defendant; instead, we recognize that jurors "remain[] free to pick and choose those portions of evidence they [may find] credible," including accepting some aspects of a witness's testimony while rejecting others, to ""weav[e] a cloth of truth"' from available materials." (*Ferrell*, *supra*, 14 Cal.5th at p. 605.) A reviewing court must not short-circuit that process.

As our Supreme Court has observed, a thorough examination of the record in cases of alternative-theory error "requires much of a reviewing court." (*Lopez*, *supra*, 14 Cal.5th at p. 581.) *Neder* provides guidance in cases in which the jury instructions omit a necessary element in a criminal offense. An appellate court "safeguard[s] the jury guarantee" when, "in typical appellate-court fashion, [it] asks whether the record contains evidence that could rationally lead to a contrary finding [i.e., in the defendant's favor] with respect to the omitted element. If the answer to that question is 'no,' holding the error harmless does not 'reflect a denigration of the constitutional rights involved.'" (*Neder*, *supra*, 527 U.S. at p. 19; see *Lopez*, at p. 581.) If, on the other hand, "the defendant contested the omitted element and raised evidence sufficient to support a contrary [jury] finding—[the appellate court] should not find the error harmless." (*Neder*, at p. 19.) Thus, even when the prosecution's case is strong, the instructional error is not harmless if the record contains evidence that could rationally lead to a contrary finding in favor of the defendant. (*Ibid.*)

That is the case here. In light of the conflicting record and the jury's general second degree murder guilty verdicts, we cannot conclude a reasonable jury could *only* find that every element of direct perpetrator or aiding and abetting implied malice liability were established beyond a reasonable doubt as to each of the defendants. It is impossible from this record to determine which defendant performed any specific act, or what knowledge or intent any defendant harbored at any critical moment. No jury finding established the identity of a perpetrator who delivered a particular blow or blows that proved fatal to Tyree.

Rodriguez's internet searches illustrate the problem presented by this record. Within hours of Tyree's death, Rodriguez Googled, "'[c]an you die if someone punches you in the armpit'"; "'[i]f you get punched in the armpit, will you poop'"; "'[c]an you die if someone punches you in the rib'"; and "'[c]an you die from punches to you?'" As *Reyes* explained, "In the context of implied malice, the actus reus required of

28

the perpetrator is the commission of a life-endangering act." (*Reyes*, *supra*, 14 Cal.5th at p. 991.) Here, the life-endangering act was apparently a blow or blows to Tyree's abdomen near his spleen or liver, delivered with enough force to rupture those organs. A jury could harbor reasonable doubt that blows to the armpit area, which evidently concerned Rodriguez, were the blows that caused Tyree's fatal injuries. A rational jury might similarly doubt whether Lubrin was among the perpetrators who inflicted the fatal blow or blows given that his yawara showed no trace of Tyree's DNA.

Jurors might also conclude Farris or Lubrin or Rodriguez was not the direct perpetrator of the fatal blow because that person was posted at the cell door. As in *Reyes*, providing general "backup" to whoever actually inflicted the fatal blow or blows is not sufficient by itself to support aiding and abetting liability for murder. (*Reyes*, *supra*, 14 Cal.5th at pp. 989-990.) Instead, the aider and abettor's mens rea must include knowledge that the perpetrator intended to commit the life-endangering act *and* that he or she intended to aid the perpetrator's commission of *that* act. (*Id.* at p. 991.)

That is not to say we believe the evidence was insufficient to support guilty verdicts for implied malice murder. As we observed at the outset, the factual record before us is striking. However, the Attorney General has conceded alternative-theory error here, and we cannot say it was """"impossible, upon the evidence,"""" for the jury to have returned general second degree murder verdicts "without also finding implied malice." (*Ferrell, supra,* 14 Cal.5th at p. 608.) Ultimately, we find respondent has not met its burden to demonstrate that instructing defendants' jury with the now-invalid NPC theory was harmless error.

We agree with the Attorney General that the jury's guilty verdict for second degree murder indicates it concluded at least one defendant harbored the implied malice necessary to constitute murder. But the Attorney General leaps from that predicate to the conclusion that because the evidence was sufficient to convict one defendant, it was sufficient to indicate the jury's intent to convict them all. As our foregoing discussion

29

shows, this approach contravenes the purpose of S.B. 1437, which was enacted to ensure "that a person should be punished for his or her actions according to his or her own level of individual culpability." (Sen. Con. Res. No. 48, Stats. 2017 (2017-2018 Reg. Sess.) res. ch. 175, ¶ 3.)

Retrial on a valid theory is permitted under these circumstances. "When there has been a postconviction change in the statutory or decisional law that invalidates a theory upon which the conviction was based and reversal is warranted, appellate courts remand the case to the trial court to allow the prosecution to retry the defendant on a legally valid theory." (*People v. Hola* (2022) 77 Cal.App.5th 362, 371.)

## DISPOSITION

The judgments are reversed. On remand, the prosecution may elect to retry defendants on a valid theory or theories of homicide.[2]

GOETHALS, J.

WE CONCUR:

MOORE, ACTING P. J.

DELANEY, J.

---

[2] Because we reverse for *Aledamat* error, we need not and do not address defendants' other claims. (See *People v. Baratang* (2020) 56 Cal.App.5th 252, 265, fn. 8.) Should the matter be retried, those issues may be revisited and resolved in the trial court.